UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
In re:                                          :
                                                :
       DREIER LLP,                    :        Chapter 11
                                                :        Case No. 08-15051 (SMB)
               Debtor.          :
------------------------------------------------------X

## MEMORANDUM DECISION GRANTING TRUSTEE'S APPLICATION TO RETAIN CONSTELLATION INVESTMENT CONSULTING CORP.

**A P P E A R A N C E S**

DIAMOND McCARTHY LLP
Attorneys for Sheila M. Gowan,
Chapter 11 Trustee for Dreier LLP
620 Eighth Avenue, 39th Floor
New York, NY 10018

    Howard D. Ressler, Esq.
    Stephen T. Loden, Esq.
    J. Benjamin King, Esq.
        Of Counsel

WINSTON & STRAWN LLP
Attorneys for Amaranth Partners LLC
and Amaranth Advisors L.L.C.
35 West Wacker Drive
Chicago, Illinois 60601

    Stephen J. Senderowitz, Esq.
    Robert L. Michels, Esq.
        Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

      Sheila M. Gowan, the chapter 11 trustee (the "Trustee") of Dreier LLP, wants to retain

Constellation Investment Consulting Corp. ("Constellation") as Special Litigation Advisor and,

potentially, as an expert trial witness, in connection with her adversary proceeding against

Amaranth Advisors LLC and Amaranth Partners LLC (collectively, "Amaranth"), entitled

*Gowan v Amaranth Advisors LLC, et. al*, Adv. Pro. No. 10-3493 (Bankr. S.D.N.Y.) (SMB) (the "Adversary Proceeding"). (*See Trustee's Application for Entry of an Order Under 11 U.S.C. §§ 327(a) and 328(a) Authorizing the Retention and Employment of Constllation* [sic] *Investment Consulting Corp. as Special Litigation Advisor in Connection with Adversary Proceedings, Nunc Pro Tunc to June 28, 2012*, dated July 3, 2012 ("*Application*") (ECF Doc. # 1402).)[1] The principal of Constellation is Boris Onefater, and the balance of this opinion will refer to them collectively as Onefater.

Amaranth has objected to the retention based on an alleged conflict. In a prior litigation, *In re: Amaranth Natural Gas Commodities Litigation*, No. 07 Civ. 6377 (S.D.N.Y.) (SAS) (the "Amaranth Class Action"), Amaranth's Chief Executive Officer Nicholas Maounis retained Onefater as an expert. Amaranth argues that Onefater received confidential information regarding Amaranth's due diligence practices in connection with that retention, and the same information is relevant to the issues in this Adversary Proceeding. (*See Objection of Amaranth Partners LLC and Amaranth Advisors L.L.C. to the Trustee's Application for Entry of an Order Under 11 U.S.C. §§ 327(a) and 328(a) Authorizing the Retention and Employment of Constellation Investment Consulting Corp. as Special Litigation Advisor in Connection with Adversary Proceedings, Nunc Pro Tunc to June 28, 2012*, dated July 17, 2012 ("*Objection*") (ECF Doc. # 1407).)

The Court heard argument on August 28, 2012, and granted Amaranth's request to submit a post-hearing *in camera* affidavit setting forth the specific relevant privileged and confidential information it alleges was disclosed to Onefater. Amaranth also filed a public

---

[1] Unless otherwise noted, citations to ECF shall refer to the electronic docket in the main case. Citations to the electronic docket in the Adversary Proceeding shall be prefaced with "AP," as follows "AP ECF Doc. #."

2

pleading. (*See Supplemental Submission in Support of Objection of Amaranth Partners LLC and Amaranth Advisors L.L.C. to the Trustee's Application for Entry of an Order Under 11 U.S.C. §§ 327(a) and § 328(a) Authorizing the Retention and Employment of Constellation Investment Consulting Corp. as Special Litigation Advisor in Connection with Adversary Proceedings*, dated September 10, 2012 ("*Supplemental Submission*") (ECF Doc. # 1464).)

For the reasons that follow, the Court concludes that Amaranth has failed to carry its burden to identify relevant confidential information that was transmitted to Onefater. Accordingly, Amaranth's *Objection* is overruled, and the Trustee's *Application* is granted.

## BACKGROUND

The Adversary Proceeding is described in detail in *Gowan v. Amaranth LLC (In re Dreier LLP)*, 452 B.R. 451 (Bankr. S.D.N.Y. 2011). The Court assumes familiarity with that decision, and limits its discussion to the facts relevant to the instant controversy.

**A.    The Amaranth Class Action**

As stated, Amaranth's objection stems from the retention of Onefater in the Amaranth Class Action, and we begin there. The Amaranth Class Action was commenced against Amaranth, Maounis and others in or around February 2008. (*See Plaintiffs' Corrected Consolidated Class Action Complaint*, dated February 14, 2008 ("*Class Complaint*"), at ¶¶ 22-40, annexed as Exhibit A to the *Trustee's Reply in Support of Application for Entry of an Order Under 11 U.S.C. §§ 327(a) and 328(a) Authorizing the Retention and Employment of Constllation [sic] Investment Consulting Corp. as Special Litigation Advisor in Connection with Due Diligence Issues, Nunc Pro Tunc to June 28, 2012*, dated Aug. 3, 2012 ("*Reply*") (ECF Doc. # 1418).) The plaintiffs alleged that certain of the defendants manipulated the prices of New

3

York Mercantile Exchange ("NYMEX") natural gas contracts in violation of the Commodity Exchange Act, 7 U.S.C. §§ 9, 13b & 13(a)(2), and the common law, (*id.* at ¶ 1), and Maounis aided and abetted those violations. (*Objection* at ¶ 11.)

In or around July of 2011, Maounis's counsel, Bingham McCutchen LLP ("Bingham"), retained Onefater to serve as a consulting and testifying expert on Maounis's behalf. (*Declaration of Peter C. Neger*, dated July 17, 2012 ("*Neger Declaration*") at ¶ 2 (ECF Doc. # 1408).) Onefater was to opine on whether Amaranth's "governance structure, investment process, and risk management procedures were acceptable and within industry standards." (*Id.*) According to Onefater, "my task was to assess whether Amaranth's risk management system was properly constructed, had appropriate management oversight, and prompted managerial responses to the information flow generated." (*Declaration of Boris Onefater*, dated Aug. 3, 2012 ("*Onefater Declaration*"), at ¶ 4, annexed as Exhibit B to the *Reply*.) Specifically, he was asked to evaluate:

> (1) Amaranth's "organizational structure and internal communication and information flow" and the qualifications of its senior personnel, as related to its natural gas portfolio;
> 
> (2) the oversight, governance, and risk management that was in place, and how Amaranth sought to understand, manage and mitigate the risk inherent to its natural gas portfolio; and
> 
> (3) "whether the risk management reporting system employed properly reported findings to Maounis and prompted a response from management."

(*Id.*)

Onefater's engagement was governed by a retention agreement between Onefater and Bingham dated July 8, 2011 (the "Retention Agreement").[2] (*Neger Declaration* at ¶¶ 2, 5.)

---

[2] The Court has not been provided with a copy of the Retention Agreement.

4

According to Peter Neger, a member of Bingham, the Retention Agreement deemed communications between members of Bingham and Onefater to be "privileged and confidential and made solely for the purpose of assisting Bingham in rendering legal services to Mr. Maounis." (*Id.* at ¶ 5.) In addition, Amaranth and Maounis entered into a Joint Defense Agreement [3] under which they cooperated with each other throughout the Amaranth Class Action.

The parties to the Amaranth Class Action also entered into two court-approved agreements that were intended to preserve the confidentiality of certain materials. The *Stipulated Protective Order*, dated Aug. 13, 2008 (the "*Protective Order*"),[4] provided that "[a]ll documents and other information produced pursuant to discovery in [the Amaranth Class Action], and deposition testimony given in [the Amaranth Class Action], shall be used only for the purposes of prosecuting or defending the [Amaranth Class Action] . . . , and shall not be disclosed to any person except in accordance with the terms hereof." (*Protective Order* at (A)(2).) It established procedures for the parties to designate documents, discovery responses and deposition testimony produced in the Amaranth Class Action as "Confidential" or "Highly Confidential." (*Id.* at (A)(3)-(5).) Persons who received "Confidential or Highly Confidential material are prohibited from disclosing it to any person except in conformance with [the *Protective Order*]," (*Id.* at (E)(1)), and the obligations imposed on the parties bound by the *Protective Order* survived the termination of the Amaranth Class Action and the termination of employment of any person who had access to such information. (*Id.* at (J)(3).) The *Protective Order* was binding on all parties

---

[3]  The Court has not been provided with a copy of the Joint Defense Agreement.

[4]  A copy of the *Protective Order* is annexed as Exhibit A to the *Neger Declaration*.

to the Amaranth Class Action and on all non-parties who signed a certification. (*Id.* at (J)(5).) Onefater does not deny that he agreed to the terms of the *Protective Order.*

The parties to the Amaranth Class Action also entered into a *Stipulation and Order Governing Expert Discovery*, dated June 18, 2009 (the "*Expert Stipulation*"), which was approved by the District Court on June 17, 2009.[5] The *Expert Stipulation* rendered certain communications non-discoverable, including communications among and between counsel to a party and that party's expert witnesses, (*Expert Stipulation* at (1)(a)(i)), and related notes, drafts, written communications or other types of preliminary work created by or for expert witnesses, including draft expert reports. (*Id.* at (1)(b).) The protections against discovery did not apply to "any communications or document upon which an expert specifically relie[d] as a basis for any of his or her opinions or reports." (*Id.* at (2).)

The Amaranth Class Action was ultimately settled on April 11, 2012. (*Objection* at ¶ 15.) As a result, Onefater was asked to stop doing work. At that time, Onefater was "in the process of researching, reviewing documents and forming opinions regarding the actions taken by Maounis in founding Amaranth, and specifically the appropriateness of the risk management structure he created and employed to monitor Amaranth's investments in natural gas futures." (*Onefater Declaration* at ¶ 2.) Onefater had not yet produced an expert report, but prepared an "incomplete draft report." (*Id.* at ¶ 12.)

**B.    The Adversary Proceeding**

The Trustee commenced the Adversary Proceeding on August 9, 2010, after the Amaranth Class Action started but before Bingham retained Onefater. According to the

---

[5] A copy of the *Expert Stipulation* is annexed as Exhibit B to the *Neger Declaration*.

Trustee's *Second Amended Complaint*, dated July 11, 2011 ("*Trustee's Complaint*") (AP ECF Doc. # 57)), Amaranth invested in Marc Dreier's Ponzi scheme, purchasing fictitious promissory notes supposedly issued by Solow Realty Company (the "Note Fraud"). She alleges that Dreier LLP paid Amaranth $28,150,479 in connection with the Note Fraud investments, and she seeks to avoid those payments and recover their value as fraudulent conveyances under the applicable sections of the New York Debtor & Creditor Law ("DCL"). (*Trustee's Complaint* at ¶¶ 1, 69-75.)

One of the principal issues on the Trustee's affirmative case and Amaranth's defense turns on Amaranth's knowledge of the Note Fraud and its good faith. *See* DCL § 272 (defining "fair consideration" to include the receipt of property in good faith); DCL § 278 (providing a defense in a fraudulent conveyance action to "a purchaser for fair consideration without knowledge of the fraud at the time of the purchase"). The due diligence that Amaranth conducted or should have conducted before investing in the Note Fraud will be a central issue at trial. (*See Objection* at ¶ 7; *accord Reply* at ¶ 6.)

The Trustee wants to retain Onefater to consult and possibly testify regarding hedge fund investment practices and due diligence. (*Application* at ¶ 9.) Specially, Onefater proposes to provide the following services:

> (a) assist in reviewing due diligence practices relating to investments, and other relevant data relating to the Debtor;
>
> (b) assist in preparing for court hearings and depositions of witnesses in which due diligence issues and Amaranth's investment practices will be addressed; and
>
> (c) potentially provide an expert report and testimony regarding due diligence practices relating to investments and other relevant data relating to the Debtor.

7

(*Affidavit of Boris Onefater in Support of Trustee's Application for Entry of an Order Under 11 U.S.C. §§ 327(a) and 328(a) Authorizing the Retention and Employment of Constellation Investment Consulting Corp. as Special Litigation Advisor in Connection with Adversary Proceedings, Nunc Pro Tunc to June 28, 2012*, sworn on July 3, 2012, at ¶ 18, annexed as Exhibit A to the *Application*.) The Trustee may ask Onefater to "review information that [Marc Dreier] provided to Amaranth and assess what the significance of that information would have been to the managers who oversaw Amaranth's investment in the fake Solow notes." (*Reply* at ¶ 7.) "One component of this analysis may include assessing whether Amaranth complied with industry norms in performing due diligence on the supposed Solow notes." (*Id.*; *see Onefater Declaration* at ¶ 6 ("The principal issue I expect to consider for the Trustee pertains to whether Amaranth followed industry appropriate due diligence procedures in determining whether to invest in the 'Solow Notes' sold by Marc Dreier, as well as the ongoing monitoring of the investment.").) Ultimately, the Trustee expects Onefater to assist her in evaluating and rebutting Amaranth's expected proof that its "due diligence of the Note Fraud was reasonable and appropriate under industry standards, and . . . that [it] had no reason to suspect that [it was] investing in a fraudulent scheme." (*Application* at ¶ 9.)

Amaranth argues that it supplied Onefater with relevant confidential information during his retention in the Amaranth Class Action, and he should be disqualified from assisting the Trustee in her lawsuit against Amaranth.[6]

---

[6] The *Application* also sought to retain Onefater as an expert in two other adversary proceedings, *Gowan v. The Patriot Group, LLC (In re Dreier LLP)*, Adv. Proc. No. 10-3524 (SMB) and *Gowan v. Westford Asset Management LLC (In re Dreier LLP)*, Adv. Proc. No. 10-5447 (SMB). The Court granted the *Application* as to *Patriot* and *Westford* without objection.

8

**DISCUSSION**

A federal court's power to disqualify an expert witness is derived from its inherent duty to protect the integrity of the legal process. *Eastman Kodak Co. v. Kyocera Corp.*, No. 10-CV-6334CJS, 2012 WL 4103811, at *7 (W.D.N.Y. Sept. 17, 2012) ("*Kodak II*"); *Grioli v. Delta Int'l Machinery Corp.*, 395 F. Supp. 2d 11, 13 (E.D.N.Y. 2005); *In re Ambassador Group, Inc., Litig.*, 879 F. Supp. 237, 241 (E.D.N.Y. 1994); *see also Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005). Where disqualification of an expert is sought based on a prior relationship between the expert and an adverse party, courts apply a two-part test: (1) was it objectively reasonable for the first party who retained the expert to conclude that a confidential relationship existed, and (2) was confidential or privileged information disclosed by the first party to the expert? *Kodak II*, 2012 WL 4103811, at *8; *Eastman Kodak Co. v. AGFA-Gevaert N.V.*, No. 02-CV-6564, 2003 WL 23101783, at *1 (W.D.N.Y. Dec. 4, 2003) ("*Kodak I*"); *Rodriguez v. Pataki*, 293 F. Supp. 2d 305, 311 (S.D.N.Y. 2003); *Topps Co., Inc. v. Productos Stani Sociedad Anomina Industrial Y Commercial*, No. 99 Civ. 9437(CSH)(GWG), 2001 WL 406193, at *1 (S.D.N.Y. April 20, 2001); *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, No. 95 CIV. 8833(RPP), 2000 WL 42202, at *4 (S.D.N.Y. Jan. 19, 2000); *Ambassador Group*, 879 F. Supp. at 242. "Only if the answers to both questions are affirmative should the witness be disqualified." *Koch Ref. Co. v. Jennifer L. Boudreaux MV*, 85 F.3d 1178, 1181 (5th Cir. 1996); *Astrazeneca Pharms., LP v. Teva Pharms. USA, Inc.*, No. 05-5333(JAP), 2007 WL 4292384, at *1 (D.N.J. Dec. 4, 2007); *Grioli*, 395 F. Supp. 2d at 14 (quoting *In re Orthopedic Bone Screw Prods. Liability Litigation*, No. MDL 1014, 1995 WL 925673, at *3 (E.D. Pa. May 5, 1995)); *Ambassador Group*, 879 F. Supp. at 243 & n.7. The party seeking disqualification bears the burden of proving both elements. *Kodak II*, 2012 WL 4103811, at *8;

9

*Grioli*, 395 F. Supp. 2d at 14; *Rodriguez*, 293 F. Supp. 2d at 311; *Kodak I*, 2003 WL 23101783, at *1.

**A.     The First Prong**

Courts have considered several factors in determining the reasonableness of a litigant's conclusion that it maintained a confidential relationship with an expert witness.  They include (1) the length of the relationship and frequency of contact with the expert, including the number of meetings between the expert and the attorneys; (2) whether the expert was provided with confidential information, work product or documents, (3) whether the parties entered into a formal confidentiality agreement, (4) whether the expert was asked to agree not to discuss the case with the opposing parties or counsel, (5) whether the expert was retained to assist in the litigation or testify as a trial witness and/or receive a fee, (6) whether the moving party funded or directed the formation of the opinion to be offered at trial, and (7) whether the expert derived any of his specific ideas from work done under the direction of the retaining party.  *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1093 (N.D. Cal. 2004) (quotations marks and citations omitted).  The focus of the inquiry is whether the relationship "would permit the litigant reasonably to expect that any communications would be maintained in confidence." *Id.*; *accord Ambassador Group*, 879 F. Supp. at 243.

Here, Onefater's employment lasted for approximately nine months.  He was engaged by Bingham as a consulting and testifying expert on Maounis's behalf.  (*Neger Declaration* at ¶ 2.) He "spent numerous hours in meetings and teleconferences" with Maounis's counsel, who considered these communications to be privileged and confidential under the Retention Agreement.  (*Id.* at ¶ 5).  He also received "more than 100 documents that were designated Confidential or Highly Confidential" under the *Protective Order*.  (*Id.* at ¶ 4.)  Onefater admits

that he received information regarding Amaranth's risk management and investment control process, (*see Onefater Declaration* at ¶¶ 2, 3, 4, 11, 12), and does not dispute Amaranth's contention that this information was privileged or confidential. Likewise, he does not dispute Amaranth's contention that he is bound by the *Protective Order* and received information designated as confidential or highly confidential under the *Protective Order*. As noted, at the time the Amaranth Class Action settled, Onefater was "in the process of researching, reviewing documents and forming opinions regarding the actions taken by Maounis in founding Amaranth." (*Id.* at ¶ 2.)

It is true, as the Trustee argues, that no confidentiality agreement existed between Amaranth and Onefater. Furthermore, Amaranth did not retain Onefater or ask him to produce an expert report on its behalf. However, Onefater was asked to opine on Amaranth's internal processes and administration. This presumably required candid communications between Onefater and Amaranth personnel or the use of information supplied by Amaranth, a party to the Joint Defense Agreement with Maounis. Accordingly, the Court finds that was objectively reasonable for Amaranth to believe that any information that it provided for use by Onefater was given in confidence.

**B.    The Second Prong**

It is not enough that the expert received confidential information in the first litigation. Under the second prong of the disqualification test, the confidential information must be *relevant* to the current litigation, *Kodak II*, 2012 WL 4103811, at *8; *Kodak I*, 2003 WL 23101783, at *2, 5; *Ambassador Group*, 879 F. Supp at 245, or substantially related. *See Bristol-Myers Squibb Co.*, 2000 WL 42202, at *5; *Ambassador Group*, 879 F. Supp at 245; *Michelson v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 83 Civ. 8898(MEL), 1989 WL 31514, at *4 (S.D.N.Y. Mar. 28,

11

1989). The movant "must identify 'specific and unambiguous disclosures that if revealed would prejudice the party.'" *Kodak II*, 2012 WL 4103811, at *8 (quoting *Hewlett Packard Co.*, 330 F. Supp. 2d at 1094); *see, e.g.*, *Ambassador Group*, 879 F. Supp. at 243 (movant's vague and ambiguous statements failed to establish that it would be prejudiced by the expert's retention). "[M]ere conclusory or ipse dixit assertions" will not suffice. *Kodak II*, 2012 WL 4103811, at *8 (internal quotations marks omitted); *accord Nikkal Indus., Ltd. v. Salton, Inc.*, 689 F. Supp. 187, 191 (S.D.N.Y. 1988); *see Rodriguez*, 293 F. Supp. 2d at 312 (defendants' conclusory assertions that they disclosed confidential information to plaintiff's expert were insufficient to meet their burden); *Greene, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, L.L.C.*, 202 F.R.D. 426, 429-30 (E.D. Pa. 2001) (same); *see also In re Bonanno*, 344 F.2d 830, 833 (2d Cir. 1965) (burden of proving the existence of privilege cannot be discharged by "mere conclusory or ipse dixit assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed").

Amaranth has failed to carry its burden of identifying confidential information imparted to Onefater during his prior retention that is relevant or substantially related to the issues on which he will consult and possibly testify in the Adversary Proceeding. Amaranth's initial opposition consisted of conclusory statements regarding what Onefater had been given, and did not support the inference that he had received communications regarding Amaranth's general or specific due diligence practices relevant to the issues in this litigation. Neger stated that he and other firm lawyers "spent numerous hours in meetings and teleconferences with Mr. Onefater discussing the Amaranth Class Action and issues relating to Amaranth's governing structure, risk management, and investment processes" and disclosed information, documents and transcripts regarding "the methods by which Amaranth's senior managers collected, reviewed and evaluated

12

information concerning the risk associated with the fund's investments." (*Neger Declaration* at ¶¶ 4, 5.) Amaranth's objection also implied that it provided Onefater with information regarding "Amaranth's due diligence and investment processes." (*Objection* at ¶ 14.)

The Trustee rebutted any suggestion that the two litigations bore the degree of relationship required to sustain the *Objection*. The Amaranth Class Action involved allegations that Amaranth had manipulated the NYMEX natural gas futures market. (*Reply* at ¶ 8.) Onefater's work pertained to Amaranth's oversight, risk management and governance in place to oversee its natural gas portfolio. (*Onefater Declaration* at ¶ 4.) Risk management refers to the *post-investment*, executive review used to oversee and gauge market risk to investment portfolios. (*See id* at ¶ 4.) Amaranth's due diligence at issue in the Adversary Proceeding refers to the *pre-investment* analysis an investor will rely on in deciding whether to invest. (*See id.* at ¶ 6). Furthermore, the due diligence analysis relating to a natural gas investment – a commodity-based product sold through an intermediary/broker dealer – would be completely different from the due diligence analysis involving a private real estate loan investment. (*Id.* at ¶¶ 6-8.)

In addition, Onefater emphatically denied that he had received or reviewed any communications regarding Amaranth's due diligence procedures. Rather, the communications related "to either Maounis' founding of Amaranth or its risk management structure regarding the natural gas positions." (*Id.* at ¶ 11.) The documents he and his associates "received and/or reviewed in the class action included court filings, deposition testimony and accompanying exhibits, financial statements, trade documentation, expert reports and accompanying exhibits, compliance procedures (anti-money laundering, code of ethics, best execution, etc.), personnel structuring documents, and various investor monthly updates." (*Id.*) Onefater could not recall any instance of "documents provided to Constellation or me that disclosed the external due

13

diligence procedures, due diligence strategies or the general due diligence philosophy of Amaranth or Maounis." (*Id.*)

At oral argument, the Court expressed its view that Amaranth's objection was too general and failed to identify any specific confidential communication relevant or related to the due diligence issues raised in the Adversary Proceeding. (Transcript of hearing held Aug. 28, 2012, at 7 (ECF Doc. # 1446).) Counsel for Amaranth expressed a reluctance to disclose confidential information publically, and suggested the submission of an *in camera* affidavit. (*Id.*) The Court agreed: "maybe the answer is an *in camera* submission in which you specifically identify what it is you think he was told or the information he received that would be in essence prejudicial to you in this particular case." (*Id.*) Amaranth's counsel responded, "[w]e can do that." (*Id.* at 8.)

Neither the public *Supplemental Submission* nor the *in camera* affidavit submitted by Amaranth supplied the promised specificity. To the contrary, the *Supplemental Submission* expressed both a reluctance and an inability to identify specific information. According to Amaranth, it was inappropriate, even in an *in camera* submission, to disclose to the fact-finder privileged or confidential communications that might bear on the sufficiency or deficiency of Amaranth's "risk management, due diligence and related matters." (*Supplemental Submission* at ¶ 6.) In addition, it was impossible to reconstruct and summarize "all of the specific communications" with Onefater. (*Id.*)

These excuses are unavailing. Judges in non-jury cases frequently review *in camera* submissions, including allegedly privileged documents, in order to resolve discovery disputes. No one suggests that the review renders the judge partial or taints the fact-finding process. Furthermore, the passage of time and poor memory presents a problem for the party with the

14

burden of proof, not an excuse to ignore it. In any event, the passage of time is not particularly significant – the Amaranth Class Action and the Adversary Proceeding moved in near lock step. Bingham retained Onefater in July 2011 while the Adversary Proceeding was pending and long after the issues of Amaranth's knowledge and good faith had surfaced. Bingham terminated Onefater's engagement in or around April 2012, less than three months before the Trustee filed the *Application*. The information regarding what was provided to Onefater should be relatively fresh as is evident from the fact that Onefater did not suffer any lack of memory. Moreover, Neger stated that Bingham provided Onefater with more than 100 confidential documents and approximately 20 deposition transcripts containing confidential information. (*Neger Declaration* at ¶ 4.) This is a small universe, and there must be records in the form of emails, correspondence or internal memoranda identifying what Onefater received. Finally, the Court never suggested that Amaranth had to supply "all of the specific communications," only those relevant to the issues in this Adversary Proceeding – specifically, Amaranth's due diligence.

Consistent with the reluctance and inability to disclose confidential information expressed in the *Supplemental Submission*, Neger's *in camera* supplemental declaration failed to identify any specific document or information given to Onefater that has any bearing on the due diligence issues in this lawsuit. It did little more than repeat the "mere conclusory or *ipse dixit* assertions" contained in the public filings. I infer from all this that Amaranth cannot point to any specific confidential communication shared with Onefater that bears in any manner on the question of Amaranth's due diligence in this lawsuit.

As a consequence, Amaranth has not carried its burden to identify confidential information that was disclosed to Onefater in the Amaranth Class Action that is relevant or substantially related to the Adversary Proceeding. Accordingly, Amaranth's *Objection* is

15

overruled, and the Trustee's *Application* is granted. It follows that Onefater will not be disqualified from serving as the Trustee's expert for the purposes identified in the *Application*, but nothing herein should be construed to relieve Onefater or any other person from the obligations and restraints imposed under the *Protective Order* and the *Expert Stipulation*. The Court has considered Amaranth's other arguments that are not specifically addressed above, and concludes that they lack merit.

Submit order.

Dated: New York, New York
November 7, 2012

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge